IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SONJA PETERMANN,

                            Plaintiff,                         OPINION and ORDER

        v.
                                                                  22-cv-332-jdp
ASPIRUS, INC.,

                            Defendant.

---

Plaintiff Sonya Peterman worked for defendant Aspirus, a healthcare provider that operates hospitals in Wisconsin. In 2021, she requested and received an exemption from Aspirus's mandate for its employees to receive the COVID-19 vaccine. Petermann contends that Aspirus then retaliated against her in multiple ways, including by requiring her to *administer* COVID-19 vaccines and terminating her when she refused. She seeks relief under Title VII of the Civil Rights Act of 1964.

Aspirus moves for summary judgment, and the court will grant the motion. No reasonable jury could find that Aspirus took an adverse action against Petermann because she requested an exemption from being vaccinated.

BACKGROUND

Plaintiff Sonja Petermann worked for Aspirus as the director of system care coordination. She was responsible for the care coordination activities at all the hospitals within the Aspirus system, and she oversaw Aspirus's utilization management team and coordinators within the clinics that were imbedded in the primary care clinics. She supervised nearly 150 employees.

In the fall of 2021, there was a surge of COVID-19 cases. This occurred while the COVID-19 vaccine was becoming accessible to more individuals and the demand for the vaccine was increasing.[1] In early November 2021, the Centers for Medicare & Medicaid Services issued a mandate that required healthcare workers in facilities participating in Medicare and Medicaid programs, including Aspirus, to receive COVID-19 vaccinations unless they had a medical or religious objection. Aspirus implemented that mandate.

Petermann requested an exemption from the vaccination requirement. She stated, "The long list of ingredients in these vaccines corrupt the sanctity of the blood with unnatural components that were not created by God. Based on the Bible's teachings, I believe this vaccine will alter my body in ways that defy the Word of God." Dkt. 30-1. Aspirus approved the exemption request for receiving the COVID-19 vaccine. But the exemption did not extend to administering the vaccine.

In late November 2021, there were more than 3,000 patients on Aspirus's waiting list to receive a COVID-19 vaccination. As a result, Aspirus identified additional staff who could help administer vaccines, including Petermann. When Petermann refused to administer COVID-19 vaccines, Aspirus terminated her.

The court will discuss additional facts as they become relevant to the analysis.

---

[1] Petermann attempts to dispute this fact, but she cites no contrary evidence, Dkt. 53, ¶ 7, and she identifies no basis for challenging the evidence that Aspirus relies on to support the fact. So the court will deem the fact undisputed.

ANALYSIS

## A.  Scope of the claims

The court's first task is to clarify the scope of the claims in the case. Petermann's complaint included three claims: (1) Aspirus retaliated against Petermann for seeking an exemption from receiving the vaccine, in violation of Title VII; (2) Aspirus failed to accommodate her religious beliefs by requiring her to administer COVID-19 vaccines and then terminating her when she refused, in violation of Title VII; and (3) Aspirus subjected her to testing for COVID-19, in violation of the Americans with Disabilities Act. The court dismissed the second claim for failure to state a claim, reasoning that Petermann had not identified a religious objection to administering the vaccines. The court dismissed the third claim for failure to exhaust administrative remedies. Dkt. 17.

After this court ruled on the motion to dismiss, the court of appeals provided additional guidance regarding what was necessary to state a claim under Title VII for failure to accommodate a religious belief against being vaccinated. *See Passarella v. Aspirus, Inc.*, 108 F.4th 1005 (7th Cir. 2024); *Bube v. Aspirus Hospital, Inc.*, 108 F.4th 1017 (7th Cir. 2024). Specifically, the court held in *Passarella* that it was enough for a nurse to say that she objected to receiving a vaccine because her body is a "temple of the Holy Spirit," 108 F.3d at 1009, and in *Bube* it was enough to say that receiving the vaccine "would be going against what God has intended for me," 108 F.3d at 1019. The court of appeals concluded that the district court erred by concluding that the employees' objections were based entirely on safety and health concerns, reasoning that "the fact that an accommodation request also invokes or, as here, even turns upon secular considerations does not negate its religious nature." *Passarella*, 108 F.3d at 1010.

In light of the new decisions, the court gave both sides an opportunity to file a supplemental brief on whether *Passarella* or *Bube* requires the court to vacate its dismissal of the failure-to-accommodate claim. Dkt. 54. Petermann did not respond to the order, and Aspirus contends that this court's order did not run afoul of *Passarella* or *Bube*.

The court concludes that *Passarella* and *Bube* do not affect the validity of the decision to dismiss Petermann's religious-accommodation claims because this case differs from *Passarella* and *Bube* in important respects. Unlike in *Passarella* and *Bube*, Aspirus *granted* Petermann's request to be excused from being vaccinated. The failure-to-accommodate claim in this case was based on Aspirus's refusal to excuse Petermann from *administering* the vaccine to patients. The court dismissed Petermann's religious-accommodation claim because the objections she raised were to receiving the vaccine, not to administering it: "She didn't give a religious reason (or any reason, really) why she couldn't administer the vaccine to others. Her belief that her body is a temple wouldn't preclude her from giving shots to patients who want to receive them." Dkt. 17, at 5. In her brief in opposition to Aspirus's motion to dismiss, she said that she objected to administering the vaccines because "as a Christian, she is called to do unto others as she would have them do unto her." Dkt. 9, at 12. But she did not allege in her complaint or her brief that she raised that objection with Aspirus at the relevant time. So even assuming that the objection identified in her brief was religious, Aspirus did not have notice of the objection,

4

which is an element of an accommodation claim. Dkt. 17, at 5; *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013).[2]

The problem with Petermann's religious-accommodation claim in this case was not that Petermann raised a religious objection to administering the vaccines but failed to sufficiently explain it. Rather, the problem was that Petermann did not identify in her complaint in this case *any* objection to administering the vaccines as opposed to receiving a vaccination. Even in *Passarella*, the court stated that an accommodation request that has no "express connection to religion will fall outside of the statute even at the pleading stage." 108 F.3d at 1011. That was the situation here, so the decision to dismiss the religious-accommodation claim will remain in the place. This means that Petermann's only remaining claim is for retaliation. Petermann's summary judgment brief includes lengthy discussions about religious accommodation and whether accommodating Petermann would have caused "undue hardship," Dkt. 38, at 8–12, 14–15, 18–19, 28–31, 37–38, which could be relevant to an accommodation claim. But they have nothing to do with the retaliation claim, so the court will disregard those portions of Petermann's brief.

---

[2] In her summary judgment brief, Petermann quotes at length from a discussion she had with her supervisor about her objection to administering the vaccines. Dkt. 38, at 8–12. She also proposes numerous findings of fact about Aspirus's knowledge of her objection. Dkt. 52, ¶¶ 27, 45–56. Petermann did not include allegations about the quoted discussion in her complaint, and she did not seek to amend her complaint to include additional allegations about what she told Aspirus about the nature of her objection to administering the vaccines. Plaintiffs generally may not expand the scope of their claims in a summary judgment brief, *see Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012), and Aspirus objects to any consideration of an accommodation claim. So the court does not consider whether the conversation or other events Petermann discusses gave notice to Aspirus about a religious objection to administering the vaccines.

**B. Retaliation**

Aspirus moves for summary judgment on Petermann's retaliation claim. The question on summary judgment is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

A retaliation claim under Title VII has three elements: (1) the employee engaged in activity protected by Title VII; (2) the employer subjected the employee to an action that is sufficiently adverse to dissuade a reasonable employee from engaging in the protected activity; and (3) the employer took the adverse action because of the employee's protected activity, meaning that the employer would not have taken the adverse action but for the employee's protected activity. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 352 (2013); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Rongere v. City of Rockford*, 99 F.4th 1095, 1104 (7th Cir. 2024).

Aspirus does not move for summary judgment on the first element. Both parties assume that Petermann was engaging in protected activity under Title VII when she asked Aspirus to be excused from receiving the COVID vaccine, so the court will make the same assumption.

As for whether Aspirus took an adverse action against Petermann, the parties discuss seven actions in their briefs: 1) counseling Petermann about one of her social media posts; 2) putting Petermann's name on a letter suggesting that she supported Aspirus's COVID-19 vaccine policy; 3) putting Petermann's name on a list of "volunteers" to give COVID-19

vaccines; 4) changing Petermann's job duties to require her to administer COVID-19 vaccines; 5) refusing Petermann's request to be excused from administering COVID-19 vaccines; 6) not following the company's progressive discipline policy; and 7) terminating Petermann.

These seven actions can be condensed into four.  Aspirus discusses the meeting about the social media post, but Petermann did not raise that issue in her complaint, and she says in her brief that she is not asserting a claim based on that meeting. Dkt. 38, at 31. So the court will not consider that issue.[3] Changing Petermann's job duties so that she was required to administer the vaccines and refusing her request for an exemption are really the same action: requiring her to administer vaccines. The alleged failure to follow the progressive discipline policy and the termination also cannot be meaningfully separated. The alleged failure to follow the policy would be adverse only because it led to the termination. So this leaves the following four actions: (1) putting Petermann's name on a letter supporting vaccinations; (2) putting Petermann's name on a list of "volunteers" to administer vaccinations; (3) requiring Petermann to administer COVID-19 vaccines; and (4) terminating Petermann.

Of the four actions, Aspirus says that only the termination is sufficiently adverse to support a retaliation claim. The argument has merit. As for putting Petermann's name on documents suggesting that she supported COVID-19 vaccines, the only harm Petermann identifies from these actions is that they put her in an "uncomfortable situation." Dkt. 38, at 39. She cites no authority that a reasonable person would be dissuaded from exercising her rights because she was incorrectly identified as supporting COVID-19 vaccines. As for being

---

[3] The complaint also does not mention the second and third items on the list (placing Petermann's name on the letter and on a list of volunteers). But Aspirus does not object that it did not have notice of the new claims, so the court will consider the merits of the claims.

required to administer vaccines, a change in job responsibilities generally does not qualify as adverse. *See Robertson v. Dep't of Health Servs.,* 949 F.3d 371, 382 (7th Cir. 2020) ("[O]ur previous cases indicate that challenged actions involving the reassignment of job responsibilities are typically not materially adverse unless there is a significant alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects.") (internal quotation marks omitted). In any event, it is undisputed that Petermann never administered a COVID-19 vaccine; she refused and was then terminated. So the only concrete harm Petermann identifies is that she was terminated.

But regardless of whether the other actions could dissuade a reasonable person from exercising her rights under Title VII, the court concludes that no reasonable jury could find that Aspirus retaliated against Petermann in violation of Title VII, so Aspirus is entitled to summary judgment.

Before discussing the parties' evidence and arguments, it is important to clarify the issue before the court. In her brief, Petermann discusses the efficacy of vaccines, the wisdom of vaccine mandates, and Aspirus's strong support for vaccines. Dkt. 38, at 32–35. Petermann also repeatedly frames the issue as whether Aspirus fired her for her "religious beliefs." *Id.* at 1–2, 4, 13, 23, 25–26. But this case is not about whether vaccines or vaccine mandates are a good idea, and Petermann is not proceeding on a claim for religious discrimination. This means that the court must assume for the purpose of this case that Aspirus was entitled to require Petermann to administer vaccines to patients. The sole question is whether a reasonable jury could find that Aspirus fired Petermann or took another adverse action against her because she asked to be excused from receiving the vaccine, or, in other words, whether Aspirus would not have taken an adverse action but for Petermann's exemption request. *Lord v. High Voltage*

*Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). The court will consider that question for each of the four actions at issue.

### 1. Putting Petermann's name on a letter supporting vaccinations

In late November 2021, Aspirus convened a meeting of several employees in leadership positions to determine how to "ensure that key vendors who frequently accessed Aspirus's hospitals, but were not enrolled in the vendor management system, follow Aspirus's vaccination requirements." Dkt. 53, ¶ 28. Petermann attended that meeting. *Id.* In response to the meeting, Aspirus employee Greg Aune drafted a letter that would be sent to three types of vendors: interpreters, nursing facility admission coordinators, and recovery coaches. *Id.*, ¶ 34.

There was a follow-up meeting on December 1. *Id.* Lisa Rowe–Peplinksi, Petermann's supervisor, convened the meeting. She testified that "the group" determined that the letter "would be sent" by employees in leadership positions related to the vendors. Dkt. 34, ¶ 9. Rowe-Peplinski said this included Petermann, who would be identified as sending the letter to the nursing facilities. The letter "was distributed" to nursing facilities on December 2 and December 3, *id.*, ¶ 10; Rowe-Peplinksi does not say who sent the letter, but Petermann was identified as the author, Dkt. 44-5. The letter states that nursing facility admission coordinators who visit Aspirus hospitals to perform services must be vaccinated. *Id.*

In her proposed findings of fact and responses to Aspirus's proposed findings of fact, Petermann says that she was not informed about the plan to put her name on the letter, and she did not agree to it. Dkt. 52, ¶¶ 28–29; Dkt. 53, ¶¶ 34–35. The testimony she cites is not so clear. She said, "I don't recall" the discussion and that she did not "anticipate" that her name would appear on the letter. Dkt. 25 (Petermann Dep. 51:15–22). That type of equivocal

testimony does not necessarily create a genuine dispute. *See Tinder v. Pinkerton Security*, 305 F.3d 728, 735–36 (7th Cir. 2002).

Regardless of whether Petermann was told about the use of her name on the letter, no reasonable jury could find that Aspirus put her name on the letter because she had asked for a religious exemption from receiving the vaccine. It is undisputed that Aspirus chose to ascribe the letter to those in leadership positions related to the vendors. Petermann also does not dispute that she fit that description for the letter being sent to nursing facility admission coordinators; part of Petermann's job was to "collaborate with skilled nursing facilities to develop those relationships with them." Dkt. 25 (Petermann Dep. 25:14–20). Petermann does not allege that employees whose names were put on the letters to the interpreters and the recovery coaches had also received exemptions from receiving the vaccine or that they otherwise objected to the vaccine. So there is no evidence that Petermann was singled out because of her position on the vaccine.

The only evidence that Petermann cites to support causation on this claim is the following testimony from her deposition:

> At this point here, they're sending out a letter about vaccines with Sonja's name on it, when previous to this, this type of letter would have never come from me. It would have not been my name on the letter. So this is a step outside of what had been the normal practice. My name would not be on that letter. Lisa's name would be on that letter. A physician['s]'s name would be on that letter. Sonja's name would not [be] on that letter.

Dkt. 25, at 52:21–53:4. Petermann does not provide any context for this testimony. She does not say what she means by "this type of letter," and she does not identify any other examples. The court understands Petermann's position to be that the timing is suspicious because Aspirus had not put her name on letters before she asked for a religious exemption.

Evidence of suspicious timing, alone, is "generally insufficient to establish a retaliatory motivation," and "any inference of causation supported by temporal proximity may be negated by circumstances providing an alternative explanation for the challenged action." *Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 634 (7th Cir. 2022). In this case, the timing is not suspicious. Aspirus was dealing with a new situation when it sent out the letter. The federal government had just issued a mandate requiring COVID-19 vaccinations for healthcare workers in facilities participating in Medicare and Medicaid programs, including Aspirus. Dkt. 53, ¶ 19. Aspirus was trying to determine the best method for communicating its own vaccination requirements to its vendors. *Id.*, ¶ 30. It makes sense that Aspirus would want the letters to come from employees who had a relationship with the vendors. Again, Petermann was not individually targeted; there were three letters to three different vendor groups, and each letter included a signature line from a different Aspirus employee.

Even drawing all reasonable inferences in Petermann's favor, the most that could be inferred is that Aspirus was dismissive of her objection to the vaccine by including her name on the letter. That might be insensitive or unfair, but it is not evidence of retaliation. It suggests that Aspirus would have put Petermann's name on the letter *regardless* of her views on COVID-19 vaccines, not *because* she objected to receiving them. The court will grant summary judgment to Aspirus on this claim.

### 2.  Putting Petermann's name on a list of volunteers

On December 3, 2021, Aspirus supervisors, including Rowe-Peplisnki, circulated a list of employees who could help administer COVID-19 vaccinations. Dkt. 53, ¶ 46. Petermann objects that Rowe-Peplinski referred to the employees on the list as "volunteers" for administering COVID-19 vaccinations, but she does not identify precisely where in the record

11

Rowe-Peplinksi did that. She cites "Ex. 8" and "Ex. 7." It does not appear that Petermann filed an Exhibit 8; it is not attached to either of the two declarations she filed with her summary judgment brief. Dkt. 43 and Dkt. 44. Exhibit 7 includes an email from someone named Scott Remmich, who referred to a list of employees "that have volunteered as Helping Hands to assist with 'other duties as assigned.'" Dkt. 44-4, at 3. The email does not specifically refer to anyone as a volunteer for administering vaccines.

In any event, Petermann cites no evidence in her proposed findings of fact or her brief that she was identified as a volunteer because she requested an exemption from being vaccinated. She alleges in her brief that she was identified as a volunteer, but she identifies no basis for inferring retaliatory intent. The court will grant summary judgment to Aspirus on this claim.

### 3. Requiring Petermann to administer COVID-19 vaccinations

In early December 2021, Rowe-Peplinski directed Petermann to help administer COVID-19 vaccines to patients. No reasonable jury could find that Rowe-Peplinski or anyone else at Aspirus gave Petermann this responsibility because she asked for an exemption from receiving a COVID-19 vaccine.

At the end of November 2021, there were more than 3,000 people on Aspirus's waitlist to receive the COVID-19 vaccine because Aspirus lacked the necessary staffing capacity to meet the demand. Dkt. 53, ¶ 41. To address this issue, Aspirus's human resources department generated a list of 73 employees who could assist with administering vaccines, using two criteria: (1) the employees had non-clinical roles (so they would not disrupt direct patient care); and (2) they held a license as a certified medical assistant, registered nurse, or licensed practical nurse (so they would be qualified to administer a vaccine). *Id.*, ¶ 46. Rowe-Peplinksi reviewed

that list and revised it "to avoid negatively impacting direct patient care and patient flow in the Aspirus system or negatively impact the implementation of the new IT system ('Epic') at the new hospitals." Dkt. 34, ¶ 15.[4]  Rowe-Peplinski also added other non-clinical employees with RN licensure. *Id.*, ¶ 16. The final list included Petermann and 24 other non-clinical employees who had one of the required licenses. Dkt. 32-3.

The parties do not cite evidence showing whether Petermann was on the original list or Rowe-Peplinski added her. Either way, Petermann does not dispute that Aspirus had a serious need for additional staff to administer the vaccine in December 2021; she does not dispute that Aspirus adopted reasonable, objective criteria for identifying staff members who were in the best position to help; and she does not dispute that she satisfied that criteria. Based on these undisputed facts, Aspirus is entitled to summary judgment on this claim.

Petermann contends that a reasonable jury could infer retaliatory intent for four reasons, but these reasons are not persuasive. First, she says that administering vaccines was not part of her job responsibilities before she made her exemption request, so the timing is suspicious. But the timing coincided with a massive rise in patients seeking vaccinations, so there is "an alternative explanation for the challenged action." *Jokich*, 42 F.4th at 634. As already discussed, Petermann was one of 25 Aspirus employees who did not have clinical responsibilities but were assigned to administer vaccines nonetheless, so she was not singled

---

[4] Petermann objects to Rowe-Peplinski's testimony on the ground that it is hearsay and lacks foundation, but Petermann does not explain the objection. Dkt. 53, ¶ 49. Rowe-Peplinski states in her declaration that she was involved in identifying employees to help administer vaccines, Dkt. 34, ¶ 14, and that testimony is supported by an email chain showing her involvement, Dkt. 44-4, at 2. Rowe-Peplinski's email states that she removed IT staff from the list and "point of care coordinators (so as not [to] create more patient throughput issues) and anybody not based in central region." Dkt. 32-3, at 1. This is sufficient to show Rowe-Peplinksi's personal knowledge, so the objection is overruled.

out. Petermann does not allege that all 25 employees were victims of retaliation or that the others were reassigned as part of an elaborate ruse to punish Petermann.

Second, Petermann says that Aspirus could have accommodated her request to be excused from administering vaccinations because she identified nine nurses working under her who volunteered to administer vaccines in her place. But Petermann is not proceeding on a religious-accommodation claim, so the question is not whether Aspirus could have addressed its need for administering more vaccinations in a different way. The question is whether the reason Aspirus gave for assigning Petermann different duties is a pretext for retaliation. *Anderson v. Street*, 104 F.4th 646, 654 (7th Cir. 2024). Aspirus says that it rejected Petermann's proposed employees because they were nurses already involved in direct patient care, and Petermann had previously said that she was short on nursing staff. Dkt. 53, ¶¶ 82–84. That is consistent with Aspirus's initial concern not to jeopardize direct patient care. Petermann does not cite evidence that any of the volunteers she recruited had nonclinical roles, and she does not dispute that she was already short staffed. So even if Petermann believes that it was unreasonable for Aspirus to reject her offer of finding volunteers, she does not have evidence that Aspirus's decision was pretextual, which is all that matters.

Third, Petermann says that the need for additional staff to administer vaccines decreased as time passed, and by mid-January, there was no longer a waitlist for vaccinations. So Petermann says that Aspirus did not need her after all. The obvious problem with this argument is that Aspirus was not asking Petermann to help administer vaccines in January; it asked her to help in December, when there were thousands of patients on the waitlist. So the change in circumstances the following month is not evidence that Aspirus was retaliating against Petermann in December.

14

Fourth, and finally, Petermann makes a related argument that Aspirus did not end up requiring *any* of the 25 employees to administer vaccines. Aspirus does not dispute this. Dkt. 52, ¶ 106. Aspirus does not clearly explain what happened, but Rowe-Peplinski's testimony suggests that the need for more employees to administer vaccines dissipated before additional employees could be properly trained and deployed. Dkt. 47, at 95:12–23. This evidence may show that Aspirus would not have ultimately used Petermann to help vaccinate patients. But Aspirus's actions are not evaluated with the benefit of hindsight. At the time Aspirus was asking for Petermann's help, Aspirus was experiencing a large demand for vaccinations that its staff could not handle. Petermann cites no evidence that Aspirus knew at the time that the demand would be short-lived. Events occurring after the fact do not shed light on Aspirus's motivation, so they are not evidence of a retaliatory motive. The court will grant Aspirus's motion for summary judgment on this claim.

### 4. Terminating Petermann

On December 10, 2021, Petermann told Rowe-Peplinski that she would not administer the COVID-19 vaccines. Dkt. 53, ¶ 77. On December 16, she was called to a meeting during which she was told that she was being terminated. In its proposed findings of fact, Aspirus says that Petermann was terminated "for not demonstrating leadership behaviors and Aspirus's values." Dkt. 53, ¶ 100. But both sides seem to agree that this means that Petermann was fired

for refusing to administer vaccines. That was virtually the only topic discussed during the December 16 meeting. Dkt. 44-22.[5]

Petermann does not appear to dispute that she was fired for refusing to administer vaccines. Much of her argument on this issue is that Aspirus refused to accommodate her religious objections. But, again, Petermann is not proceeding on a religious-accommodation claim, so the court cannot consider that argument. This means that the court must assume that refusing to administer vaccines was a lawful reason to terminate Petermann. This dooms Petermann's claim.

Petermann says that Aspirus should not have fired her because her record with Aspirus was otherwise exemplary. She also says that Aspirus did not follow its progressive disciplinary policy. She contends that both factors support a reasonable inference that Aspirus was out to get her because of her religious beliefs.

The evidence Petermann cites does not suggest that Aspirus terminated her for seeking an exemption from receiving a COVID-19 vaccine. Aspirus does not allege that Petermann had performance problems other than those related to her objections to the vaccine, but Title VII does not prohibit employers from terminating employees based on one deficiency. The question is whether the termination decision was retaliatory, not whether it was wise or fair. *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 795 (7th Cir. 2015).

---

[5] In in its opening brief, Aspirus also refers to one of Petermann's social media posts and an alleged refusal to speak to vendors about the COVID-19 vaccine. Dkt. 27, ¶ 20. Aspirus also states in its proposed findings of fact that Petermann "repeatedly refused to follow directives from leaders," without providing any examples. Dkt. 53, ¶ 68. Aspirus does not cite any documents or testimony showing that these issues contributed to the decision to fire Petermann, so the court will not consider them.

A finding of pretext may be supported by evidence that an employer did not follow its own policies, *Hobgood v. Illinois Gaming Bd.*, 722 F.3d 1030, 1039 (7th Cir. 2013), but Petermann has not cited evidence that Aspirus violated the company's disciplinary policy. The policy refers to steps that Aspirus *may* take before terminating an employee, such as coaching and a reprimand. But it also states that "[m]anagement, in agreement with Human Resources, has the discretion to give an employee any level of corrective action from a written record of verbal warning to termination, based on the facts, circumstance and resulting implications of the infraction." Dkt. 43-12, at 4. Petermann points to no other employees who received more favorable treatment for a similar performance issue. In any event, Petermann's supervisors had multiple communications with Petermann over email and in conversation asking Petermann to help administer vaccines. Dkt. 53, ¶¶ 76–87.  But Petermann made it clear that she would not do so. So Petermann's refusal was more than just a one-time infraction that Petermann promised not to repeat.

 Aspirus's decision to terminate Petermann rather than take a lesser disciplinary action may show that the COVID-19 vaccination program was important to Aspirus, and it wanted its employees to toe the corporate line. Perhaps Aspirus could have been more accommodating. Regardless, Aspirus's insistence is not evidence that Aspirus was retaliating against Petermann for seeking an exemption that the company granted. Rather, it is evidence that, absent a granted exemption, Aspirus would not tolerate insubordination related to its vaccination policies. Enforcement of those policies is not retaliation, so the court will grant Aspirus's summary judgment motion.

17

ORDER

IT IS ORDERED that Aspirus, Inc.'s motion for summary judgment, Dkt. 26, is GRANTED. The clerk of court is directed to enter judgment for Aspirus and close the case.

Entered September 18, 2024.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge